UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ANTWAIN T. JACKSON                                    CIVIL ACTION

VERSUS

SAINT HELENA PARISH POLICE
JURY, ET AL.                                     NO. 22-00834-BAJ-SDJ

RULING AND ORDER

In this employment action, Plaintiff pursues claims of termination without due process, disability discrimination, and retaliation against his former employer, Defendant Saint Helena Parish Police Jury (the "Police Jury"), and a separate claim of battery against his former supervisor, Defendant Albert Franklin.

Now before the Court is Defendants' **Motion to Dismiss Pursuant to FRCP Rule 12(b)(6) (Doc. 30)**, seeking dismissal of Plaintiff's action with prejudice. Plaintiff opposes Defendants' motion. (Doc. 31). For the reasons stated herein, Defendants' motion will be denied.

## I.   ALLEGED FACTS

The following facts are accepted as true for present purposes.

The Police Jury is a political subdivision of the State of Louisiana and is the governing authority of Saint Helena Parish. (Doc. 35 at ¶ 4). Defendant Albert Franklin is the Police Jury's Road Superintendent. (*Id.* ¶ 5).

Employment at the Police Jury is governed by the Police Jury Employee Handbook and Personnel Manual (the "Manual"). (*Id.* ¶ 89). Among other things, the Manual sets forth procedural requirements that must be satisfied before a

"permanent employee" may be terminated. (*Id.* ¶ 92). Specifically, the Manual states:

> A permanent employee shall not be discharged or disciplined, except upon written and signed charges from his or her Department Head and after a hearing before the Police Jury.
>
> At least (10) days in advance of the hearing, the Department Head with the approval of the Police Jury shall furnish the affected employee a copy of the written charges against him or her.
>
> The employee shall have the right to appear before the Police Jury with witnesses in his/her behalf and with council of his selection, all of whom shall be heard by the Police Jury at said hearing.
>
> If a permanent employee is found guilty of the offense charged, after due hearing, and is disciplined or discharged by the Police Jury, the Department Head supervisor shall furnish the employee with a written statement of the recommendation or removal or discipline, which shall include the exact reason, offense or instance upon which the recommendation is based.

(*Id.*). Strangely (perhaps), despite outlining these procedures, the Manual does *not* define the term "permanent employee." (*Id.* ¶ 93).

On August 11, 2020, the Police Jury hired Plaintiff as a CDL Driver and Tractor Operator. (*Id.* ¶ 13). At the time he was hired, the Police Jury paid Plaintiff a wage of $16.00 per hour (later increasing to $17.50 per hour), (*id.* ¶ 13), and put no limitations on the "time frame for his exit," (*id.* ¶ 95). On this basis, Plaintiff alleges that he was "a **permanent employee** of the Police Jury." (*Id.* ¶ 96, emphasis in original).

Beginning in March 2021, Plaintiff alleges that he suffered a series of "incidents" that culminated in his unlawful termination. These "incidents" form the basis of this lawsuit.

### A. March 2021 Incident

Plaintiff alleges that on March 15, 2021, Superintendent Franklin assigned him to a four-man crew tasked with removing untreated sewage from road ditches. (Doc. 35 ¶¶ 14-15). The job required one employee to drive a dump truck, one employee to operate an excavator, and two employees to flag traffic. (Id. ¶ 17). Franklin assigned Plaintiff to operate the dump truck, to which "Plaintiff complained to Franklin that the dump truck in question had a pneumatic leak and that because of the leak, the tailgate would sometimes swing open on its own." (Id. ¶¶ 18-19). Superintendent Franklin brushed off Plaintiff's complaint, responding that the "crew would have to use the truck with the pneumatic leak." (Id. ¶ 20).

Later, when Plaintiff was driving the loaded truck, "some of the raw sewage spilled on the road." (Id. ¶ 23). Plaintiff did what he could to clean up the mess, (id. ¶ 25), but was nonetheless reported to Superintendent Franklin when he refused to continue operating the same truck. (Id. ¶ 28). Superintendent Franklin summoned Plaintiff to his office, where Plaintiff offered to drive another truck. (Id. ¶¶ 29-30). Superintendent Franklin rejected Plaintiff's offer, cited Plaintiff for "insubordination (refuse [sic] to do job assignment)," (Doc. 29-2), and suspended Plaintiff for two days without pay. (Id. ¶ 31). Thereafter, on March 18, 2021, when Plaintiff "failed to call in exactly at 7:00 a.m." for his next assignment, Franklin called Plaintiff and told him "not to come to work until further notice." (Id. ¶ 33).

Ultimately, "Plaintiff was off work without pay for almost a full 30 days" following the March 15 Incident. (Id. ¶ 36). Upon Plaintiff's return to work, Police Jury President Frank Johnson informed him that he "should be paid … lost wages

3

because … Policy states that the Superintendent only has the authority to suspend an employee for two days," but that this remedy was not available to Plaintiff because he failed to "call in on March 18." (Id. ¶ 38). The same day, Superintendent Franklin "told plaintiff that he would not fire [him] but that he (Franklin) would make [him] quit." (Id. ¶ 39). "About this same time, Franklin began calling plaintiff **FATASS.**" (*Id.* ¶ 40, emphasis in original).

### B. July 2021 Incident

On June 30, 2021, Plaintiff tested positive for COVID-19. (Doc. 35 ¶ 43). At the time he tested positive, "[t]he Police Jury allowed [infected] employees, plaintiff included, to take approximately three weeks of paid leave." (*Id.* ¶ 48). Despite this policy, Superintendent Franklin "expected plaintiff to return to work in seven days," "called plaintiff several times while plaintiff was out on leave and asked when plaintiff would be returning to work," and "instructed plaintiff to get retested and if negative, to return to work." (*Id.* ¶¶ 46-47, 50).

On July 20, 2021—precisely three weeks after Plaintiff tested positive for COVID-19—the Police Jury implemented a new policy requiring that "all employees must work from 6:00 a.m. to 7:00 p.m., seven days a week, until further notice." (*Id.* ¶ 51). Any employee that failed to "comply" with the new work schedule would "be laid off until further notice." (*Id.*; Doc. 29-3). Despite not having fully recovered from COVID-19, Plaintiff returned to work on July 21, and worked for two weeks without incident.

### C. August 4, 2021 Incident

On August 4, 2021 Plaintiff reported to work on time, and proceeded to the mechanic shop, where Police Jury employees assembled at the beginning of their shifts. (Doc. 35 ¶¶ 54-55). On this day, Plaintiff was the first to arrive and took a seat in a chair at the front of the shop. (*Id.* ¶ 57). Plaintiff was occupied with his phone when Superintendent Franklin arrived and immediately began taunting him:

> 59. The first word out of Franklin's mouth directed to plaintiff was: **HEY, FATASS.**
>
> 60. Plaintiff ignored Franklin's insult.
>
> 61. Franklin addressed plaintiff a second time: **HEY, FATASS.**
>
> 62. Again, plaintiff ignored Franklin's insult.
>
> 63. Franklin addressed plaintiff a third time: **HEY, FATASS.**
>
> 64. Again, plaintiff ignored Franklin's insult.
>
> 65. Franklin walked over to where plaintiff was sitting and kicked plaintiff on his legs and said: **HEY FATASS, YOU HEAR ME TALKING TO YOU?**
>
> 66. When Franklin kicked the plaintiff, Franklin knocked plaintiff's cell phone out of plaintiff's hands.
>
> 67. Plaintiff was understandably angry at being insulted three times by his supervisor and then being physically attacked by his supervisor, but despite being provoked, did not do or say anything to Franklin.
>
> 68. Plaintiff went on to plaintiff's regular assignment.

(*Id.* ¶¶ 59-68, emphasis in original).

Later that day, Plaintiff informed Police Juror Ryan Byrd of the incident, who, in turn, confronted Superintendent Franklin. (*Id.* ¶¶ 69-70). "Franklin called the

plaintiff and tried to apologize. Franklin's explanation was: **I just did that because I want you to fit in like everybody else.**" (*Id.* at ¶ 72, emphasis in original).

### D. August 5, 2021 Incident

"On August 5, 2021, Plaintiff notified Franklin that he was not feeling well and would not be able to see his doctor until Monday, August 9, 2021." (Doc. 35 ¶ 74). In response, Franklin cited Defendant for "failure to cooperate" and "refus[ing] to perform assigned duties," (Doc. 29-4), and informed Plaintiff that he "was laid off until further notice." (Doc. 35 at ¶ 75). Superintendent Franklin wrote on Plaintiff's disciplinary form: "Report 8/11/21 at 6:00 a.m. for further instructions." (Doc. 29-4).

### E. Plaintiff is diagnosed with "long COVID"

Following the events of August 4 and 5, Plaintiff took measures to protect himself from Superintendent Franklin. First, on August 6, Plaintiff "filed a complaint with the Saint Helena Parish Sheriff's office" regarding the August 4 Incident. (*Id.* ¶ 76).

Second, on August 9, Plaintiff attended his doctor's appointment (as scheduled), at which time he was diagnosed with "shortness of breath and cough" persisting from his COVID-19 infection. (Doc. 35 ¶ 77). Plaintiff's doctor discharged him with the following note, which Plaintiff "presented … to all members of the Police Jury":

> Mr. Antwain Jackson has shortness of breath and cough that has persisted from a recent covid [sic] 19 infection. This has limited his ability to work long days. Your consideration in this matter is appreciated. I have added steroids and an inhaler to improve his symptoms.

(*See id.* ¶¶ 77, 79 119-120; Doc. 29-5).

6

Third, also on August 9, Plaintiff contacted the New Orleans Office of the Equal Employment Opportunity Commission (EEOC) to inquire about filing a complaint. (Doc. 35 ¶ 78).

Fourth, on August 10, Plaintiff submitted a written grievance to the Police Jury complaining of Superintendent Franklin's abuse, specifically alleging (1) "[Mr. Franklin] has constantly referred to me … [as] 'FatAss' … instead of my actual name," (2) "[he] has a personal vendetta against me," and (3) "[h]is behaviors have now escalated from a [sic] mental distress to physical abuse. Very recently, after refusing to reply to his belittling name calling, Mr. Franklin took it upon himself to walk over and kick me." (Doc. 35 ¶ 79; Doc. 29-6). Plaintiff's grievance prompted the Police Jury to schedule "a meeting" for August 24 "at which plaintiff's employment status would be discussed." (Doc. 35 ¶ 80). Ultimately, however, this meeting was cancelled. (*Id.* ¶ 81).

Finally, on October 6, Plaintiff submitted a discrimination charge to the EEOC. (*Id.* ¶¶ 81-82). The next day (October 7), the EEOC informed the Police Jury of Plaintiff's charge, prompting Superintendent Franklin to tell Police Juror Byrd, **"Jackson filed a complaint against us, we need to get rid of him."** (*Id.* ¶ 84).

The next week, Plaintiff was hospitalized for three days with blood clots in both lungs, and "continues to have COVID 19 related symptoms: shortness of breath, memory lapses, brain fog, and fatigue." (*Id.* ¶¶ 85-86).

On November 9, 2021, the Police Jury terminated Plaintiff's employment. (*Id.* ¶ 87). Plaintiff's November 10 termination letter cites no cause for termination, stating only:

> Re: Termination of Employment
>
> Dear Mr. Jackson:
>
> This letter constitutes official notice of your termination of employment with the St. Helena Parish Police Jury, from your position as Laborer for Road District 5, effective as of November 9, 2021. Please return all property and/or tools provided to you. Your healthcare benefits will be terminated as of November 10, 2021. You will be paid your accrued entitlements and any outstanding pay up to and including your last day of employment.

(Doc. 29-7). Superintendent Franklin was copied to Plaintiff's termination letter. (*Id.*).

## II.    PROCEDURAL BACKGROUND

On October 6, 2021, Plaintiff filed a charge of disability discrimination and retaliation with the EEOC. (Doc. 35 ¶ 6). On July 28, 2022, the EEOC issued Plaintiff a right-to-sue letter. (Doc. 29-1).

On October 26, 2022, Plaintiff initiated this action. (Doc. 1). Plaintiff's operative Second Amended Complaint pursues claims against the Police Jury, Superintendent Franklin, and State Farm Insurance Company (Superintendent Franklin's liability insurer). Against the Police Jury, Plaintiff alleges termination without due process, disability discrimination (based on Plaintiff's "long COVID"), retaliation, and supervisory liability for Superintendent Franklin's tortious conduct. (Doc. 35 ¶¶ 88-134, 142). Against Superintendent Franklin, Plaintiff alleges a single claim of battery. (*Id.* ¶ 135-141).

Now the Police Jury and Superintendent Franklin jointly move to dismiss Plaintiff's action, contending that Plaintiff's claims fail as a matter of law. (Doc. 30). Plaintiff opposes Defendants' motion. (Doc. 31).

## III.    LAW AND ANALYSIS

### A. Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (*citing Twombly*, 550 U.S. at 556). When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (internal citations omitted).

### B. Discussion

The Court addresses Defendants' arguments in the order that the appear in

Defendants' motion.

### i. Procedural Due Process

To state a constitutional procedural due process claim for termination of employment, a plaintiff must allege that (1) he has a property interest in his employment sufficient to entitle him to due process protection, and (2) he was terminated without receiving the due process protections to which he was entitled. *LeBeouf v. Manning*, 575 F. App'x 374, 376 (5th Cir. 2014) (citing *McDonald v. City of Corinth, Tex.*, 102 F.3d 152, 155-56 (5th Cir. 1996)). The Police Jury's sole challenge to Plaintiff's due process claim is that he has failed to assert a property right in his continued employment. (Doc. 30-1 at 2-3).

"An employee has a property interest in his employment only when a legitimate right to continued employment exists." *McDonald*, 102 F.3d at 155. Here, Plaintiff expressly alleges that he was a "permanent employee" entitled to all pre-termination procedural protections set forth in the Police Jury's Personnel Manual. (Doc. 35 ¶¶ 92, 95-96). The Police Jury may disagree with Plaintiff's characterization of his employment status, and the evidence may ultimately show that Plaintiff's position was *not* "permanent," but those are questions for summary judgment. Accepting Plaintiff's allegations as true, and viewing them in his favor, Plaintiff has adequately alleged a legitimate right to continued employment sufficient to sustain his claim. *E.g., Leleux-Thubron v. Iberia Par. Gov't*, No. 13-cv-852, 2014 WL 3722026, at *7 (W.D. La. July 24, 2014) (Doherty, J.) (plaintiff's allegations that she was a "permanent" Iberia Parish employee based, in part, on Parish's Personnel Policy Manual guidelines, "sufficiently set forth a property interest entitled to procedural

10

due process protection").

### ii. Disability Discrimination[1]

To state a prima facie case of discrimination under the ADA, a plaintiff must allege three elements: "(1) he is an individual with a disability, (2) who is otherwise qualified to perform the job, with or without reasonable accommodation, and (3) he was subject to an adverse employment decision on account of his disability." *Tanner v. Charbonneau Indus., Inc.*, No. 18-cv-00866, 2019 WL 7040933, at *3 (M.D. La. Dec. 20, 2019) (Jackson, J.) (citing *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016)). Here, the Police Jury challenges two elements of Plaintiff's prima facie case, contending that "long COVID" is not a disability within the meaning of the ADA, and that, in any event, Plaintiff has not adequately alleged that he was terminated due to "long COVID." (Doc. 30-1 at 4).

The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, and working." *Id.* § 12102(2)(A). The determination of whether an individual is substantially limited in a

---

[1] Plaintiff pursues disability discrimination claims against the Police Jury under both the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and its Louisiana counterpart, the Louisiana Employment Discrimination Law, La. R.S. § 23:301, *et seq.* ("LEDL"). For present purposes, there is no meaningful distinction between the two statutory schemes, and the analysis above merely refers to the elements of an actionable ADA claim. *See Labit v. Akzo-Nobel Salt, Inc.*, 209 F.3d 719 n.1 (5th Cir. 2000) ("Louisiana courts apply federal jurisprudence to assess discrimination claims under [the LEDL]; thus we will consider the claims simultaneously.").

major life activity must be made on a case-by-case basis. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).

"District courts have reached different results on whether to recognize COVID-19 as an ADA-qualifying disability," and "the Fifth Circuit has not yet decided who has the burden of proving that an impairment is (or is not) transitory and minor." *Alvarado v. ValCap Grp., LLC*, No. 21-cv-1830, 2022 WL 953331, at *4 (N.D. Tex. Mar. 30, 2022) (Fitzwater, S.J.). Notably, however, since July 2021 the U.S. Department of Health and Human Services, and the U.S. Department of Justice have advised that "long COVID can be a disability" under the ADA.[2]

Plaintiff alleges that, as a result of "long COVID," he continues to "experience[] heart palpitations, chest pain, [and] shortness of breath," "substantially limit[ing] [his] cardiovascular function and circulatory function, among others." (Doc. 35 ¶¶ 114-115). Given Plaintiff's express allegations that he suffers symptoms impairing major life activities (cardiovascular function and circulatory function), the fact-specific inquiry that would be required to determine whether COVID-19 is a physical impairment that is (or is not) transitory and minor, the Executive Branch's guidance, and the divisions that exist among both District and Circuit Courts, the Court declines to dismiss Plaintiff's disability discrimination claim at this stage solely on the basis that "long COVID" is not a qualifying disability. This element of Plaintiff's claim will benefit from evidentiary development. *E.g.*, *Alvarado*, 2022 WL 953331, at

---

[2] Guidance on "Long COVID" as a Disability Under the ADA, Section 504, and Section 1557, *available at*: https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/guidance-long-covid-disability/index.html (last visited Nov. 30, 2023).

*5 (declining to dismiss plaintiff's COVID-19 disability discrimination claim at Rule 12, determining that it would benefit from evidentiary development).

The Police Jury's second challenge—that Plaintiff has not alleged that he was terminated due to "long COVID"—is, again, contradicted by Plaintiff's allegations. Plaintiff contends that after his August 9 doctor's appointment (at which he was diagnosed with lingering COVID-19 symptoms), he made a written request to be relieved from the Police Jury's mandatory 7-day work schedule, which the Police Jury ignored. (Doc. 34 ¶¶ 77-81, 120-126). Shortly thereafter, "the Police Jury, acting through its Superintendent, Albert Franklin, suspended the plaintiff without pay and ultimately terminated plaintiff's employment." (*Id.* ¶ 127). Drawing reasonable inferences in Plaintiff's favor, these allegations support a determination that he was fired on account of his "long COVID."

### iii.    Retaliation

A valid retaliation claim requires that the plaintiff demonstrate (1) that he engaged in a protected employment activity, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action. *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001). "[A] plaintiff who files a complaint with the EEOC engages in a protected activity." *Carter v. Target Corp.*, 541 F. App'x 413, 418 (5th Cir. 2013) (citing *Haire v. Bd. of Sup'rs of Louisiana State Univ.*, 719 F.3d 356, 367 (5th Cir. 2013)).

The Police Jury contends that Plaintiff's retaliation claim fails because it relies solely on "temporal proximity" between Plaintiff's October 6 EEOC complaint and his November 9 termination. (Doc. 30-1 at 7-8). Again, however, the Police Jury ignores

the operative allegations. Plaintiff specifically asserts that after he submitted his EEOC complaint, Superintendent Franklin—Plaintiff's direct supervisor, whose actions previously included suspending Plaintiff without pay—"told Jury [M]ember Byrd: **Jackson filed a complaint against us, we need to get rid of him.**" (Doc. 35 ¶ 84, emphasis in original). Just weeks later, Superintendent Franklin's name appeared on the face of Plaintiff's termination letter. (Doc. 29-7). Plaintiff's allegations, accepted as true, establish a direct causal link between Plaintiff's EEOC complaint and his termination, easily surpassing a claim based on mere temporal proximity. *See Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) ("Direct evidence is evidence which, if believed, proves the fact without inference or presumption."). Plaintiff has alleged a plausible claim for retaliation.

### iv.  Battery

In Louisiana, battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987) (citing authorities); *see* La. R.S. § 14:33 ("Battery is the intentional use of force or violence upon the person of another[.]"). "The intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent." *Caudle*, 512 So. 2d at 391.

Here, citing exclusively to criminal cases, Defendants argue that Plaintiff's allegations do "not meet the requisite 'force or violence' necessary for an actionable 'simple battery'" because Superintendent Franklin merely "contacted [Plaintiff] with his foot to get his attention when he failed to respond." (Doc. 30-1 at 9). This argument

is a nonstarter. First, it assumes facts not alleged in the complaint—*i.e.*, Franklin's "justification" for kicking Plaintiff. Second, whatever Franklin's justification, an actionable *civil* battery occurs when the defendant commits an "offensive contact." *Caudle*, 512 So. 2d at 391. Plaintiff alleges that Superintendent Franklin kicked him hard enough to "knock[] [his] cell phone out of [his] hands," after calling him "**FATASS**" four times. (Doc. 34 at ¶¶ 59-66, emphasis in original). Under any measure, Plaintiff has plausibly alleged an "offensive contact" sufficient to sustain his civil battery claim.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' **Motion To Dismiss (Doc. 30)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 30th day of November, 2023

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**